The District Court here granted summary judgment thinking that the claims at issue here were essentially the same as the claims that were considered in the earlier ESC case before this court. But the claims are not. The claims in the earlier case, as this court will recall, very broadly covered analogs of rapamycin, and that was construed to cover any molecule that was structurally similar to rapamycin, and therefore there was essentially no meaningful structural limitation. As a result, this court explained that the universe of compounds structurally similar was potentially limitless. This case involves unrelated patents with different inventors working for different organizations, and the claims are much, much tighter. The patents use the term rapamycin, there is no reference to analogs. The definition has precise structural and functional limitations, which have to be considered together. Structural limitation, it must have a specific macrocyclic triene ring produced by an identified bacterium, and this is the active moiety, the entirety of it, and it is fully defined. You only have about 10 minutes, and I'll tell you that I think that you have a very strong case on written description, so I want you to start with where I think your case is less strong, because any of these grounds, if we were to affirm them, would blow you out of the water. So you might as well start where your case is more difficult, it seems to me. If you don't mind, would you move to enablement on the rapamycin issue as opposed to written description? Sure, I'd be happy to do that, Your Honor. With respect to... If I could... Sure. Oh, I'm sorry. I just had one quick question, and this is a discreet question. Well, it may not be discreet, but it's separate. You mentioned functional, the role of the functional restriction, and this has always puzzled me, and it particularly puzzles me in this case as to what role we ought to, what weight we ought to assign to a functional restriction in the claim or in the definition of the product. You say, for example, in your brief that, well, there are only seven of these things that have been shown to work, and therefore we're talking about a very small universe. But how can that be pertinent to the question of either enablement or written description, since I could say, for example, well, I have discovered one compound among all, let's say, benzene ring-type compounds that is effective in combating breast cancer, and I claim all other benzene-type compounds that work. And then I come into court and I say, there are only four of them that have been found, including the accused infringers, therefore we're talking about a very small number. Why wouldn't my argument be as valid as your argument? I think the functional limitations are under this court's precedence. I think the functional limitations have to be viewed in combination with the structural limitations. Do they add anything to the structural limitations is my question. In other words, when you say, well, only seven of these compounds, I wrote in my margin, so what, question mark. So I want you to tell me, so what. Because I think they define the universe much more narrowly. Why do they define it? You've artificially defined it by the results reached by others, achieved by others. I mean, you've essentially stacked the deck, I think, in favor of saying, well, you don't have to search very far. Look, you've already found four, and you've only found four. Therefore, it's a small universe. I think they really limit what is involved. We know that you have to have the active moiety, the macrocyclic trigonogram, and then the question is, well, what else could be done to it? So functional limitations provide a further restriction on that. And we know that because, for example, in order to have biological activity, it has to be less than around 1,200 Daltons. And that's in the record. That's bringing your universe of what is covered by the claim down considerably. And that is important to written description because it differentiates it from those cases like Rochester, where it's virtually unlimited. All you have is a functional. Okay, well, I don't want to take up any more of your time, but I think you've given me the answer. Right. Turning to the enablement issue with respect to rapamycin, Your Honor, the enablement question is whether a person's skill in the art could make and use the invention without undue experimentation. And I think there are a couple of points that I would address here. First, this court's recent decision in Cephalon versus Watson is extremely important because what that case makes clear is that the burden is on the defendants to come forward and show, with some specificity, what the amount, the type, the character, the extent, the nature of the experimentation is that would be needed to make and use the invention. They put nothing in the record here. And by contrast, when you look at the record here and the declarations of Wormerling, of Serafini, of Williams, of Fuller, they put a lot of evidence in that was essentially ignored and simply disregarded by the district court as to how one could make or use the invention. Once you know what the active moiety is, and that was really kind of at the heart of what Morris and Gregory discovered, once you know that that will work in order to treat or prevent the invention. The court, the district court, effectively reversed the burden of proof and put it on us to come forward and show what the amount and the character and the type of the experimentation is, and just really flipped it and had it backwards. Those are tribal issues of fact. They didn't put anything in here, but if the cases were amended for trial, the underlying issues of fact as to what it would take to use a different rapamycin besides sirolimus, those are the issues that would be tried in the jury, and we think we're entitled to a trial on that. Well, what about the fact that your specification doesn't disclose how to make the full genus? Does that enable the full scope of the claim? Your spec doesn't disclose that. You talk about it as though it's a new use on a known compound, but it's not. It's a new use on a known compound, and it's unknown analog. That's what you're claiming. Well, I think there are a couple of answers to that, Your Honor, and again, I think I would really refer the court to the declarations of the experts. The expert declarations that we submitted in this case were, each of them was around 100 pages, extremely detailed, laying out what was known at the time, citing to publications, to articles, the things that were known to people still in the art. Williams was a synthetic chemist. He has a lengthy declaration that is on the record, and Williams explains how one would synthesize the compounds. But the invention here is the use of the active quality, and the appendages that would be attached to that, that's the sort of thing that would be routine for a chemist to do if he wanted to make them. But you have to try all the variations. I mean, why isn't this a hunting license? How many variations are there? Thousands? Well, on this record... You've got to sit there and try them all. Well, I think there are... But on this record, it doesn't show that one of still in the art would gravitate towards, well, these are the ones. Well, I beg to differ on that, Your Honor, because what the record does show is that you're going to maintain that active moiety. The record shows that you're going to keep any molecule under around 1,200 Daltons, so it's a rather confined universe we're starting with. To begin with. Well, how confined? How many compounds would satisfy those two requirements to the extent that the record suggests anything? My understanding was in the tens of thousands range. Is that correct? I don't think the record suggests that at all, Your Honor. I think there's attorney argument in the brief that they put in. If you look at pages 38 and 39 of their reply brief, there's attorney argument. They ask you to take judicial notice of it. What the record actually shows is that you're going to try to keep that molecule quite small so that it will pass through the cell wall, and it shows that there are seven to eight that have been identified. But again, seven that are effective. So we're back to function. Well, seven that meet the combined restrictions, because you can't... One of the restrictions being that it's effective. Right, but again, that's not telling us how many there are out there that either haven't been examined or are part of a large class, many of which are not successful. They didn't put any evidence in on that. It's their burden to do it. That's the point of it. This case is coming up on summary judgment. And I think the district court may have lost sight of that, too, and engaged in fact-finding. But what we have is attorney argument here. Well, remember, questions of summary judgment, and you've raised that evidence. In the red brief for Abbott and Medtronic on page 44, they say, referring to your page 30, your blue brief, appellants assert without citation that the court can see from reviewing Dr. Wormley's declaration that it is anything but conclusory. And they say, indeed, it is conclusory in those pages. We're looking at 029682683, pages 44 and 45 and so on. Tell me what's in there that's not conclusory. Because there's a lot of non-conclusory stuff in those affidavits. But in those pages, it sure looked like it was conclusory. I think this may deal with the transnormals and the rectal administrations, Your Honor. And this is a place where I think the defendants actually led the district court into error on that, what happened was there are two summary paragraphs in a portion of the Wormerling Declaration dealing with written description. And the district court quoted those two paragraphs as if that was the entirety of the declaration on transnormal and rectal administration. Very misleading, because there are other portions of the Wormerling Declaration that apparently the district court was unaware of or was confused about that went through chapter and verse pages explaining how, using what was known at the time, one could have made those embodiments. And the pages, the specific pages of the Wormerling Declaration that the district court either ignored or wasn't aware of are listed in our reply book. We actually went through and cited them. And if you go back and you look at those, you'll see that there is a complete explanation of how one of skill and the art would have known how to make those two implementations. Now, you were assaulting defendants and you were suggesting that the district court sort of had turned the burden on its head because they haven't introduced the evidence that would establish the difficulty of ascertaining, you know, through other experimentation, the working analogs that would effectively meet the limitations of the claim. But, I mean, why have some scientists and experts testified at 66, 79 to 81 that there's nearly an infinite number of analogs that result from varying just substitutes at or beyond the C37 position? And here's a quote from your biologist at 66, 82. Until you test the analogs, you really can't tell whether they work or not. Well, so I guess the question I was trying to get from you was, you know, you've got an infinite number of possibilities and why isn't this just, you know, like a try to hunt? You know, you're just out there shooting sort of randomly your own scientists and biologists. Why didn't they present the evidence upon which the district court could conclude that this is undue experimentation? Yeah, and I think there are a couple of answers there. First of all, you have to look very carefully at the things that have been quoted here because a lot of these things are dealing with changes on the macrocyclic brain. When you actually look at the testimony, that's what a lot of it relates to, including the Morris testimony. Well, substituting at or beyond the C37 position, is that right? No, that is not. That's right on point, isn't it? Yes, it is. All right, that's page 66, 79 to 81, and 66 to 82, and that's what I quoted to you. But the second point is the one that I made earlier, and that is, that is without regard to the functional limitations which further constrain this. Once you recognize... You really can't tell whether they work or not. That seems to me, work or not, work for what purpose? Obviously, for the purpose of the function you articulate. That's what he's testifying on. But the number of compounds, which is one part of that, is much reduced once you recognize that you're not going to be above around 1,200 Altons. The 1,200 Alton issue is claim construction, and as far as I understood, you're not appealing claim construction, right? I don't think that's claim construction, Your Honor. That argument was made by them. This is a question, this is an evidentiary fact that would relate both to written assertion and enablement, which is how broad is the claim? A person with skill in the art would understand when they look at this... How broad is the claim? Boy, that sounds like claim construction to me. But isn't, Your Honor, I would think that's one of the issues that you're looking at under Ariadne and others for purposes of written description and enablement, is the breadth of the claim. What have you claimed? What is the scope? And the 1,200... Even on 1,200 Altons, it's still 10,000 possibilities, right? 10,000. I'd say that's not in the record. I don't think that's in the record, Your Honor. I think that's a turning argument. I think it's in their breed. I think it's backing and filling. So, but I gather that the Necrosyclic train ring uses up about 800 of those Altons, so to speak. So, you've got 300 or 400 to play with? Right. Right. That's a lot of possibilities. And it counts for one. But the question of enablement, when one measures enablement and what it would take to enable and to make and use an embodiment of the claim, one really has to look at it. If someone presents you with a... Apparently I've gone well beyond my time here, but when you look at it, the question really is, if I presented you with a rapamycin, would you be able to make and use it in the embodiment? Would you be able to use it to treat or prevent respinosis? The question is not, how long would it take me to ascertain what every compound is that is covered by a claim? That has never been the test that has been applied by this court. Let me ask you one other question now, jumping back to the other half of the case. Do you think it's fair to say that your argument would be the same effectively if instead of referring to the, what is it, five methods of administration in the claim, the claim had simply said, and I'm looking at claim one of the 781, a method for treating respinosis dot dot dot, in which the drug is administered by a means effective to transmit a therapeutically effective amount, period. I think our claim is actually narrower, Your Honor. I mean, it's pretty standard in pharmaceutical patents to claim administering a compound to treat. Well, but what I'm really trying to get at is, you suggest that, well, you really shouldn't focus so much on the transdermal and rectal methods of administering the drug, because the core of the invention is the use of rapamycin, and it's, for our current purposes, analogs, to treat respinosis. Okay. But are you really saying that I could simply say, and still have a valid claim, any method of administering, as long as it's effective, as long as it can produce what someone will ultimately conclude is an effective amount, that that would be valid? I think it would be, Your Honor. I think pharmaceutical claims typically claim, broadly claim, any method of using a drug to treat an illness. It's understood that they encompass all of the known and conventional therapies. Here, the draftsman of the patent actually carved it back and listed six or seven of them there. But, so even if you didn't have even a single, well, I guess you don't, really. You don't have any evidence that, at least in human, that this can actually work. You say, as long as I know that rapamycin is effective, if administered correctly, to treat respinosis, then I get a claim to any method of administering rapamycin. I think the evidence here does show that it would work, Your Honor, because what Morris and Gregory demonstrated was that the systemic administration of it will work to treat or prevent respinosis. You simply have to get it into the body, into the system, into the blood system. That's what the patent shows. That's what their experiments demonstrated. And, again, I wouldn't disagree. The rat experiments. The rat experiments. Right. But, I mean, we don't, for obvious reasons, we don't have human experiments. Right. Typically, that's the way the patents come up. But, in this instance, if you look at Wernerling and you look at the other declarations, they explain how these other methods, transdermal and rectal, will get it into the body systemically. I mean, no fair reading of this patent would suggest that these inventors were claiming to have invented suppository. No, I didn't. It just wasn't the invention, and you've got to enable the novel parts of the invention. I'd like, if you don't mind, one more question on this point that you just got to, which was transdermal and rectal administration. And, what do we do with the fact that the inventors here didn't help the case at all? Right? I mean, well, I realize we look at the specification to determine whether the specification would have revealed to one of the skilled in the art that the inventors possessed it. What do we do when the inventors come along later and say, but I didn't possess it? It's almost like they were adverse witnesses here for you. I mean, what do we do in that situation? The inventor says, well, I don't care how you read this back. I didn't possess it. I know that's not exactly what they said here. I'm not saying it is, but I want you to answer the hypothetical. We're looking at the facts to see, one of the skilled in the art is trying to divine from the specification whether it evidences the inventor possessed it. What if we have testimony directly on the point the inventor said, I had no idea, not a darn clue how to make that happen. Hey, if I can claim that, great stuff. Give it to me. But, I didn't know how to do it at the time. What, because I feel like you have almost argued the inventor's testimony at this point is irrelevant, and I don't, certainly doesn't feel irrelevant to me. So, I'd like to know your thoughts on it. First of all, Dr. Morris said that he expected that they would work, and that is in the record. That he thought that they would work, and he wouldn't have claimed that he didn't think they would work. But, I think the other answer to that, Your Honor, is that He doesn't wrap it up that way. He doesn't wrap up that way. He does, he does. I think the other point here But, he thought they would work, but he had no idea. Would you say he admitted that he didn't have any idea how to make them work? There's a very important point here that I wasn't quite of, and that is it was stipulated and agreed by the parties that the person of ordinary skill would include the skills of a skilled formulator. And, that's very important that that was agreed to. So, we start the analysis with the assumption But, is it fair to say that he admitted that he had no idea how to make that work? He didn't know how to administer them, but that's true of virtually any pharmaceutical patent. Inventors on pharmaceutical patents typically, typically are the biologists and the chemists in the laboratories. They're not the formulation people. Well, are formulation people listed as inventors on this patent? Not on this patent, no. Dr. Morrison-Gregory But, given the state of the art, which was reprimised and had never been used rectally or transdermally. In fact, nothing had ever been used rectally or transdermally to treat restenosis at all. I mean, this seems, this seems like an issue upon which you might want to pull one of those people in, wouldn't you? I mean, the inventors here had no idea how to make it happen, and nobody in the industry had ever done it before. What is your evidence that he possessed it? Not that one of you would be able to do it, which I think is the point you just said about a formulator. But, what is the evidence that he possessed it? What is the evidence that a formulator, looking at this patent, would say, ah, that non-formulator, I can tell he possessed it from the way he disclosed it in the spec. Dr. Richard Morrison-Gregory Let me, let me, two parts to that answer. First, I want to go back to the first point, which is virtually all pharmaceutical patents, the named inventors are not the formulators. And if we start holding them to the standard that they can't get a patent unless they know how to administer their drugs themselves with all of the conventional techniques, we're going to be casting doubt. Wait a minute. Doesn't written description say the inventors must possess the invention? The invention, they must possess the invention. The invention here is the use of rapamycin. Rectally and transdermally. Rectally and, well, that's included. And if these inventors did not possess the ability to use it rectally or transdermally, how can they secure a claim that covers that? They were entitled to coverage of any conventional mode of administering it. The question would be, with respect to things that are not the novel parts of the invention, did people with skill in the arts know how to do it? Ah, and that's absolutely true for enablement. You've got me on enablement. But not on written description, which doesn't pertain at all to would one of skill in the arts be able to fill in the missing gaps. Written description requires the inventor to possess his invention as claimed. And that's what's bothering me here. Well, I think that it is in the specification. There is a description of using this in the specification. They were in possession of the idea of using these conventional well-known techniques to deliver the drug. It's indisputable. It's there. It's in those words. It's laid out. The question then really does become after that one of enablement. Is there enough there for one to do it? And the point, Your Honor, that this is the first time it's been done, again, I mean, that's the argument they've made. But again, I would refer the Court to the Wernerling Declaration, that rapamycin, there were 18 formulations of rapamycin that were known at the time. Transdermal and rectal delivery was known at the time. Lipophilic molecules like this had been delivered in those ways. People knew how to do it. There was an extensive body of literature out there. And yes, nobody had delivered rapamycin to treat restenosis because nobody knew it would work for restenosis until these inventors discovered it. A revolutionary discovery. But the question of how you get it into the body, into the system, through a suppository or through a transdermal patch? Wernerling explains how you get it. And claim rapamycin, but don't try to claim it in a method of use when you don't know how to make the method of use work. But, Your Honor, if they had claimed it broadly and said, administering rapamycin in order to treat restenosis, that would encompass all ways of delivery. But maybe they can't get that claim if they can't actually walk the walk. You don't walk the walk, you don't talk the talk, you can't do it. They don't know how to make it happen. They shouldn't get that claim. They get claims for what they know how to make happen. They created rapamycin. You're right. Fabulous invention. Spectacular invention. And they should be rewarded for their claims on rapamycin. But do they then also get claims for methods of use that they don't know how to actually use it that way? Well, Your Honor, that gets back. There was a time when the patent office would limit these patents to the mouse experiments to deliver it into the gut. That's what they actually did. But the research chemists who come up with pharmaceutical inventions and then claim methods of treatment, administering those drugs, have always been allowed to claim the conventional well-known ways of delivering the drug. We're going to be embarking on a very new system here if we're going to start to say that the people, the biologists and the chemists who invent new uses of drugs and then claim conventional delivery techniques for them are limited to claiming what they, as non-formulators, actually knew. The point here is that they put it in the specification that these conventional techniques could be used. And at that point, it really resolves itself to an issue of enablement. The description requirement is satisfied. I'll refer you about the time. I know I can ask a lot of questions. Thank you. Okay? So, Mr. Wolf, you and Mr. Moss are dividing your time 8 minutes, 7 minutes. Yes, Your Honor. Thank you. So, if you go a little bit over, given how much over I went with Mr. Pritikin, that's okay. But at some point, I'm going to have to cut you off to make sure he gets the turn. Your Honor, I will do my best to stay within the 8 minutes. May it please the Court, there is no dispute that the specification is the touchstone of prescription description and enablement. There is no dispute that the specification in this case is silent, as to any drug other than sirolimus. Completely silent. There is no depiction of sirolimus' structure, let alone a discussion of what changes can be made to that structure and have it still work. There is no discussion whatsoever as to the mechanism of action of sirolimus, or any other the one sirolimus molecule may work and others won't, how to make or use sirolimus or its analogs. It is simply silent. In short, the specification does not show any possession of any drug other than sirolimus for treating restenosis, and it does nothing to help one make or use any drug other than sirolimus. Well, you say it doesn't help us make another drug other than sirolimus. It certainly seems to me that when you start off with a macrocyclic triene ring that is specifically derived from a particular bacterium, you've given the next person in line a very substantial head start in coming up with the next drug, haven't you? No, Your Honor. In fact, the reason is precisely what Judge Moore suggested, which is scientists after scientists on their side of the beef acknowledge you make a little change, you get a big result. And there was a fiction in Mr. Pritikin's argument that there was a substantial difference in the claim scope in DSD1 versus this case, because substantially all of the analogs we were talking about in DSD1 were changes outside the ring. We're already starting with the ring Your Honor just referenced. I'll give you one example. The cotton reference that was specifically mentioned in the DSD1 opinion, and that is at 13785 in this record, is all about changes to the C42 position outside the ring. We weren't talking in DSD1 about analogs by changing the ring. We weren't any closer then. But Mr. Wolf, in DSD1, in the opinion itself, it makes clear that one of the factors that weighed on the decision was the fact that the specification itself admitted the infancy of the state of knowledge on rapamycin. And I think the opinion correctly lays out that patentee has to live and die by his own words and his own specification. I recognize that this patent comes earlier in time than that one. However, I mean, something like I stated in the specification is akin to an admission to be used against that patentee. There is no similar thing here. And you have YS experts opining at a summary judgment stage that similar compounds with modifications were known to have the same mechanism of action and biological activity based on assays disclosed in the specification. In particular, I'm talking about A13-135 and Paragraph 135-138. So you've got expert testimony here. It seems awfully factual on a factual issue. And you don't have that admission. And this is summary judgment. What do I do with all that? Two responses, Your Honor. In fact, there is something similar. Not the same, but something similar here to what happened in DSD1. And that is that on the face of the patent, there is a citation, and in fact, they rely on it heavily in the briefs, to Dr. Morris' 1992 contemporary article. It's cited on the face of the patent. And in that, he says, and this is at 6895, if we strive to understand thoroughly the little that is known about rapamycin, he goes on, and then... That's a factual dispute. That's not something in the specification. Well, it's... It's a factual dispute. There's an article written somewhere where he talks about the infancy of the state of the art, but here you've got an expert going the other way. It's a factual dispute. It's summary judgment. Your Honor, respectfully, the second point I was going to make is that all of that discussion, and there's a shell game that goes on in Cortis' brief, because everything that's being discussed there is about immunosuppression. Recall that the functional limitation here is immunosuppression and restenosis. Those are the two things you need to take care of. All that was known about rapamycin was about immunosuppression. Nothing was known about restenosis in any of the art that's cited. And so when there's... There is no knowledge in the art to create a fact issue. More to the point, Your Honor, there was a reference to cephalon. The fact... The record here is very different than in cephalon. It is undisputed in this case... Wait. The patent in this case itself discloses assays related to restenosis. So for you to say nothing was known, how can you say that about restenosis? The patent provides it. In the prior art I'm talking about, Your Honor, nothing... The discussion... I'm trying to figure out whether there's written description and enablement support for this patent. And you can say there's nothing in the prior art on the application of this drug to restenosis, but guess what? There's a matter filled in that gap in the prior art. Your Honor, there's nothing in the specification at all about any drug other than sirolimus. Nothing. What they attempt to do is say we're going to satisfy both written description and enablement by looking to the prior art to gap fill. Well, you can't gap fill when there's, as Your Honor rightly points out, there's nothing in the prior art about restenosis. So if they invented, if they invented anything, something to do with sirolimus, not with its analogs, not with the tens of thousands or millions or, frankly, infinite number of analogs that come into play. And as I was saying with cephalon, we have a record here. In the mid to late 90s, Wyeth and Novartis both investigated hundreds and hundreds of analogs and only came up with a handful, less than a handful, of analogs that might be worth investigating. Is that in this record? It is, Your Honor. Where is it in the record? Your Honor, in our brief we cite the extensive discussion of... Of the undue experimentation. Yes, Your Honor, of the Wyeth and Novartis experiments. It was 225, I believe, done by Wyeth and analogs were investigated and more than 600 investigated by Novartis, and that is in the brief, Your Honor, and I can submit that to the page site. What about the elusive number that showed up, I guess in the brief, the 10,000 or maybe even tens of thousands, I don't remember which it was. Is there anything in the record that tells us what the number of the pertinent analogs is under 1,200 Daltons? Your Honor, what we know, and of course the 1,200 Dalton is a 1,200 Dalton-sized red herring. It was introduced after the expert reports... Okay, let's live with it. Okay, so Dr. Morrison, this is at 6786 of the record, was asked specifically in light of the court's claim construction. Now, focusing on the court's definition of rapamycin, how many compounds have the characteristics of that definition? Sorry, what page are you on? This is 6786 of the record, and his answer was, and he didn't give a number, he said, so you can make many, many variants. So Dr. Morrison was presented, specifically asked about the claim construction in this case, and his answer was, many, many. There was follow-up, wasn't there, to the effect of, well, once you start cutting down the size, I think it was follow-up on size, then he said, well, that slams it down, or words to that effect. Wasn't that his testimony? Well, but that was to a different question. When specifically presented with the claim construction, and this goes to where you started this whole discussion half an hour ago, Your Honor. Within the 1200 Dalton limit, which isn't a limit at all, the record says there's no, their own experts say there's no magic cutoff. The other thing is, it's not... But there is some support for the proposition, I take it, that once the molecule gets large enough, it's not coming through, and therefore there's a screening mechanism that, where there is 1,000 or 1,200 or 1,500 that is operative, that keeps the number of potential candidates down. Correct? There is an outer limit. Now, I would note, Your Honor, that there's nothing in the record that that outer limit was known in 1992. In fact, the only site presented by Cordes and Debrief for the knowledge at the time was, in fact, Dr. Sabatini saying, don't ask me, I'm not an expert on this. So, even if there were a 1200 Dalton limit, it's not clear at all from this record that it was known at the time. In any event, simple math dictates that, and again, going back to the cotton reference, for example, all of the analogs we're talking about are changes outside the ring, or we're talking about in the less than 100 Dalton range, and Drs. Camardo, Bansback, and Adelman, we cite in our brief, at 6681 and 6682, or rather at the brief sites that wrap up their testimony, all acknowledge that these little changes can make or break the drug. And so, when we're told we have no record, that we haven't met our burden, what do we know? And I'll conclude with this, Your Honor, unless there are further questions. There's going to be one, at least one real quick one. Okay. We know that there's no discussion of any analogs whatsoever in the specification, how to make or use them, or that they possess them. We know that there are, at a minimum, and at page 29 of the reply brief, Cordes seems to concede that there are at least tens of thousands of compounds that meet the structural limitation. We know that a single change can make all the difference. We know that Wyatt and Novartis tested hundreds to reach a total of three. All of these are undisputed facts. They invented sirolimus, if anything, not the full scale. So you're saying they bring the number down from tens of thousands by the functional limitation? That's who brings it down. Why is this? Wyatt is saying they're not tens of thousands. You're saying there are, and then you point us to the reply brief, which says that, as I read it, the structural requirements would theoretically include tens of thousands, or at least there's evidence of that. Right. But the way, where you and Wyatt disagree is over the significance, I take it at least implicitly, of the functional limitations. Absolutely. Would you agree with that? By the way, those same functional limitations existed in BSC-1. So what is the role of those functional limitations? How much weight should we attach to them? This goes back to my colleague. Absolutely. There is analytically no difference between this and a claim that says, I've invented a drug that cures cancer. You're telling folks, all right, this is what our goal is. Go figure out whether you can make and use a drug that meets that goal. That's all it does. The language is replete through the cases, the invitation to the fishing expedition. I was fishing four days ago, and I had more success than I was going. You claimed, and maybe my memory isn't right, and I just pinged my clerk, and he claims my memory is right, but you may prove us both wrong. You claimed in BSC that same functional limitation was present. I don't remember it, and I don't remember it being in that claim construction in BSC, and I'll certainly go back after this argument to double-check, but did you misspeak? Well, no, Your Honor. To give you an example, the 286 patent claim one, a device comprising, and it goes on to describe the drug, and then the final phrase is, in an amount effective to inhibit neo-intimal proliferation, which is the technical term for restenosis. So the part that was construed didn't include the functional limitation in BSC one, but the functional limitation was in the same claim limitation as that. So if there was any door-slamming shot in the universe, it was exactly the same as in BSC one, because you had the same issue. If it didn't effectively reduce neo-intimal proliferation, well, then we could have excluded it from the potential universe of candidates. So, Your Honor, you're right. It wasn't in the construction that was to be discussed, but it was in the same claim limitation. Judge Wallach, did you? Yeah, you hit it in the reply brief. That satisfies me that at least it's not all lawyer-driven. Thank you, Your Honor. And with that, I'll turn it over to Mr. Moss. Mr. Moss. Your Honor, as you may please look forward, I will be addressing the Section 112 issues relating to the administration routes. Now, despite what appellants argue in the brief, and I think they say it at least ten times in their reply brief, the invention claimed in the Wyeth patents is treating respinosus with rapamycin eight different ways, including transdermally and rectally. But treating respinosus these ways was nothing more than a research plan, a wish. Nobody had ever done it, and the inventors admitted they didn't know how or whether it could be done. They didn't possess it, the fundamental aspect of written description. So let me, just backing away from this case a bit, suppose that you have discovered that this compound is effective if there's some way to get it to either the spot of the injury or somehow in the system of the injured mammal. Yes, Your Honor. This is effective to deal with respinosus. But you don't know which particular method of getting it there or for that matter the precise dosage and so forth would work. How would you claim that invention? And that's the issue that you discussed. First of all, you have to show that you were in possession of the invention. You may have a claim that simply says by effective means that do such and such. Do you think that claim would be valid? It would come down to claim construction first and foremost. And what I mean by that is the claim would be construed to cover conventional roots. Roots that people would understand with a particular drug could be done. Nothing exotic such as rectal or transdermal for a drug like rabomycin. You have to look at the drug. You look at the specification and you decide. And that was the red herring here because the claims here actually go on and say that they invented delivering this drug transdermally. And they did it... But they have an expert that testifies that, let's see, he opined that an inventor of this method of use would understand that the drug may be administered in formulations that have not been actually reduced to practice. So it hasn't been done yet, but their expert testified that one of skill in the art would know it could be done and that this was a, quote, and this is his quote, conventional method of administration. It may be that no one had done it with rabomycin. It may be that no one had done it to treat retinosis. But he claims it's a conventional method of administration. Okay, maybe nobody had treated eye problems by putting a drug in a pill before and you swallow it. Most of the time it was eye drops. But if one of skill in the art, and in fact an expert, tells us no, no, no, there's no reason to think that it wouldn't also work here. Isn't that creating a factual question given that written description is a question of fact? Not on this record where the expert here simply said because the words were there, ipsis verbis, that's enough. But we know from all the decisions you need to look at written description and the level of disclosure under the nature and the state of the claims and the state of the art. And here... But he did, and he said that it was conventional to do this and there was no reason to think that it wouldn't work here. Well, his conclusory opinion was that... I didn't treat it as a conclusory opinion. It would work. The section on written description, and in his testimony he did say, but you would understand that the inventors had possession of it just by virtue of the fact that they said it, that they stated it. Yes, to me, that's intellectual attainment of the concept. That, based on the state of the art at the time, which is what he said in... And the state of the art, Your Honor, was that no drug had ever been administered rectally to treat restenosis. Rapamycin had never been formulated... This is a question of facts for the jury, because he says that the rectal treatment is a conventional method, and that he doesn't see why it wouldn't work. Why isn't that enough? Because the whole point is disclosure in the patent and possession. And these inventors did not have possession. They never worked with restenosis rectally. They acknowledged that it was the patent attorney that simply put this delivery route in. There is one single Ipsos verbus sentence, and the inventors didn't know one way or the other. Respectable guesses aren't enough. The whole point of the written description requirement, and if you go to even the area of decision, is to reward inventors for the difficult work of invention, and what they mean by invention is a full conception of a final and clear plan. Let me make sure I understand, maybe in light of what you've just said, I'm not sure I do understand your answer to my first question. My question to you was, would it be valid if they had, at least with the claim, overcome the invalidity issue that you're talking about now, if they had simply claimed the administration of rapamycin to treat restenosis through conventional means? Right. Period. Is that okay with that past muster? It would depend on how that were construed. If it were to be construed consistent with their invention, which is all they knew was that injection, for example, would work for this large drug, for this large drug, then, based on that claim construction, then the claim would be valid. Do you think the claim could only be valid then if it were limited to the particular means of administration that was used on the rats, which was peritoneal? No, if, for example, this were some other drug that was a very small molecule drug that in the literature there was no issues, you know, getting it through the skin or getting it through, that's a different situation. But with rapamycin, we know that it is incredibly large, unstable, and virtually insoluble. And the state of the art was that for drugs like that, you couldn't get it across the skin. You couldn't get it across the skin. And you have to enable the full scope of the claims. And so if it were to be construed, if a claim just simply saying administration were to be construed to cover transdermal and rectal, it would be invalid. Wyeth tried 30 formulations to get penetration through the skin with this drug. And none of them would work. And they stopped the program and they said, penetration is unlikely because of the large and insoluble nature of this molecule. And their expert, the best he could do, was say, well, the only thing I could come up with that might work for transdermal would be if I take the skin off, the top layer of the skin off. Well, that's not in the patent. There's nothing in this patent except this generic Ipsos-Virgus reference to do it rectally or do it transdermally. That's it. And again, I go back to first principles in terms of possession. Why did they claim that they invented a way of doing this transdermally and rectally when they hadn't? Why did they do it? And Dr. Morris was asked the question. And Mr. Pritikin referred to the fact that, well, this isn't really part of the claims. Well, it is part of the claims. It's axiomatic that what is in the claims is in the claims. Dr. Morris was asked at a deposition and he said, looking at claim one, question, you believe that the novel aspects of claim one, the elements that really reflect your invention, are the use of rapamycin to inhibit intimal thickening caused by mechanical injury. And Dr. Morris answered, and this is at A10176, page 194 of the deposition, well, claim one also adds the various ways of administering rapamycin, so I would have to include that as well. Mr. Moss, do you have a final thought? We've got to wrap this up. Yes. Yes. My final thought is that there was no possession here. Ipsis verbis is not enough in light of the state-of-the-art, which was essentially non-existent. No one had done respinosis with any drug rectally and transgerminally, and this drug was notoriously difficult to formulate and it couldn't be done. Thank you very much. Thank you. Mr. Pardico? I think what the argument today highlights is the fact-intensive nature of the dispute that exists here. We're asking for a trial. We think we're entitled to a trial. The argument today sounded a lot like a trial, where the parties are talking about what the facts are and what the disputed facts are. A couple of points I want to respond to, and I think I can be fairly brief. Let me start with the question of the number of compounds and see if I can bring some clarity to that. And let's be precise about this. The testimony that there are tens of thousands that meet the structural limitation, that is not the number that would be covered by this claim. So you're back to the functional argument. The functional argument is important, Your Honor, and this Court has long recognized that functional limitations, they may not be good enough by themselves. I'm not going there. We don't need to go there. But where you've got the active moiety that is actually described there and then you superimpose on top of that functional limitations, that brings your claim down. It bounds your claim. And as Dr. Williams said, it slams the number of compounds that could be covered. One of ordinary skill would understand that. Second, from the standpoint of enabling this, these are routine tests. Again, it's fact issues. Maybe I'm going to win and maybe I'm going to lose if we go back to trial on this. But these are factual disputes as to what they are. And this is a case where those tests are actually laid out in the patent specification. They're in vitro and there are in vivo tests that are laid out in the specification and it would be a routine matter. There's expert testimony that it would be a routine matter to test these compounds. Now that's what is required for enablement. They put in no evidence, none, as to what would be required in order to test those compounds or that it wouldn't be routine. We heard Mr. Wolf talk a couple of times about all of the compounds that Wyeth had tested. And I want to respond to that. This was for a commercial product. What Wyeth was doing was developing the use of rapamycin for transplantation patients to prevent the immunosuppression in transplant patients. And they were looking at variants of rapamycin in their program trying to come up with something for commercial development. That's true both as to formulations and as to the project that they had to try to develop these additional drugs. And again, one has to be very careful when you look at the record here. Because what you'll find when you look at the record and it's in the appendix here is that the reason many of these were discontinued was not that the drugs or the active moiety didn't work, but because they couldn't find something better than sirolimus. I mean, that's the difference between commercial development and what's involved in a patent. Of course, the company discontinues the program if they can't find something better than the parent drug. And that's what the evidence shows here. The bottom line is that because of the factual disputes that permeate this, we are entitled to a trial. We're entitled to present these arguments to a jury and let a jury decide all of these underlying issues. We submit that there was more than sufficient evidence presented to get us to trial, to get us over that hump to allow us to go to trial. And that is particularly true on this record, where the defendants chose not to put in any declarations of their own from their experts. We ask that the case be remained for trial. Thank you, Mr. Burdekin. I thank both counsel and the case is taken under submission.